IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RENA PULLIAM, Special Administrator of the estate of Ronald Evans, Jr., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 C 7318 |
| v. | ) ) | Judge Virginia M. Kendall |
| THE CITY OF CHICAGO; NATALY JANIK; LAWRENCE LOWERY, JR.; JAMES NORWOOD, II; LEON PAYNE; STAN ROGERS; BRODERICK SNELLING; JEROME STARKS; TABITHA TABB; SHELLY TOWNSEND; CHRISTOPHER WARE; and KENNETH WEBB, JR., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rena Pulliam ("Pulliam"), Special Administrator of the Estate of Ronald Evans, Jr., ("Evans") sued Defendants Nataly Janik ("Janik"), Lawrence Lowery, Jr. ("Lowery"), James Norwood II ("Norwood"), Leon Payne ("Payne"), Stan Rogers ("Rogers"), Broderick Snelling ("Snelling"), Jerome Starks ("Starks"), Tabitha Tabb ("Tabb"), Shelly Townsend ("Townsend"), Christopher Ware ("Ware"), and Kenneth Webb, Jr. ("Webb"), police officers working for the City of Chicago ("the City") (collectively "the Officer Defendants") under 42 U.S.C. § 1983 alleging that they deprived Evans of his life without due process of law in violation of the Fourteenth Amendment. Pulliam also sued the City under § 1983 alleging that the deprivation of Evans's life was caused by a custom, policy, or practice of the City (the Officer Defendants and the City are collectively referred to as "the Defendants"). The Defendants move for summary judgment on both

counts of Pulliam's Amended Complaint. For the reasons stated below, the Court grants the Defendants' Motion for Summary Judgment.

<u>**STATEMENT OF UNCONTESTED FACTS**</u>[1]

This case involves the tragic drowning death of a five-year-old boy. At approximately 8:30 p.m. on July 3, 2008, near the time the sun set that day, Roland Evans fell from the seawall into Lake Michigan. (Pl. 56.1 Resp. ¶¶ 1, 3.) Melissa Wright ("Wright") and her friend Angela Holness ("Holness"), who were standing near La Rabida Children's Hospital across the harbor inlet from Jackson Park in Chicago, IL, saw Evans playing near the water on the last step of a tier of rocks with two older boys. (Pl. 56.1 Resp. ¶ 1.) Wright saw the two older boys climb up the stack of rocks. (Pl. 56.1 Resp. ¶ 2.) She saw Evans start to follow the older boys and then he turned his body as if looking for something he had dropped. (Pl. 56.1 Resp. ¶ 2.) Both Wright and Holness then saw Evans fall into the water from across the harbor. (Pl. 56.1 Resp. ¶¶ 1-2.) Evans, who was not able to swim, immediately went underwater and did not return to the surface again. (Pl. 56.1 Resp. ¶ 2.) Wright called 911 at 8:35 p.m. (Pl. 56.1 Resp. ¶ 3.)

The first Chicago police officers arrived at the scene within five minutes of Wright's 911 call. (Pl. 56.1 Resp. ¶ 3.) Lowery, Webb, Rogers, Webb, Tabb, Townsend, and Janik all responded to the 911 call. (*See* Pl. 56.1 Resp. ¶ 18.) Payne, Norwood, Starks, and Snelling were off duty at

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Defendants' Local Rule 56.1 Statement of Uncontested Facts have been abbreviated to "Def. 56.1 ¶ __." and citations to Pulliam's Objections Defendants' Local Rule 56.1 Statements of Uncontested Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __."

Pulliam fails to include in her response numbered paragraphs that correspond to each paragraph in the Defendants' Statement of Uncontested Facts. *See* L.R. 56.1(b)(3)(A). For its convenience, the Court has numbered each paragraph in Pulliam's response directed toward the Defendants' statements of facts and refers to them in that way. For example, the paragraph referring to the Defendants' facts 1-10 is referred to as "¶ 1," and so on.

The Court addresses the other deficiencies in the parties' Local Rule 56.1 filings in Section I, *infra*.

the time and were not in the vicinity of Jackson Park Harbor during the incident. (Pl. 56.1 Resp. ¶ 18.) At the time of the incident, the Officer Defendants were employed by the City and acting within the course and scope of their employment and under the color of law. (Pl. 56.1 Resp. ¶ 1.) When the officers arrived, the falling dusk limited their visibility. (Pl. 56.1 Resp. ¶ 3.) It was windy and the water was "choppy," "rough," "strong," "blustery," and "fierce." (Pl. 56.1 Resp. ¶ 2.) The officers searched the water from the seawall, but they could not find the boy and they did not have any information other than the fact that there was a body in the water. (Pl. 56.1 Resp. ¶ 4.)

It was not easy to enter or exit the water at the place where the Officer Defendants searched for Evans. (Pl. 56.1 Resp. ¶ 7.) On the west side of the harbor from where the Officer Defendants stood, there was a heavy railing at ground level. (Pl. 56.1 Resp. ¶ 7.) Below the railing running west into the harbor was a nearly vertical concrete wall that was approximately six feet high. (Pl. 56.1 Resp. ¶ 7.) At the base of the concrete wall was a narrow ledge, approximately two and a half to three feet wide. (Pl. 56.1 Resp. ¶ 7.) The ledge sloped slightly toward the water. (Pl. 56.1 Resp. ¶ 7.) Below the ledge was a corrugated steel wall approximately four feet high, which descended down into the water. (Pl. 56.1 Resp. ¶ 7.) The steel wall was smooth and had no ladder or handholds. (Pl. 56.1 Resp. ¶ 7.) The seawall in the north of where the Officer Defendants searched was composed of large blocks of stone or concrete arranged in three tiers of approximately four feet stepping down from ground level to lake level. (Pl. 56.1 Resp. ¶ 7.) The drop from the lowest tier of stone or concrete blocks to the water was approximately four feet. (Pl. 56.1 Resp. ¶ 7.) The stone or concrete blocks were smooth and there were no handholds. (Pl. 56.1 Resp. ¶ 7.) About 150 feet from where the Officer Defendants were searching there was a small area of sand that rose above the

water level.  (Pl. 56.1 Resp. ¶ 7.)  Except for the area near the sand, the lake bottom was not visible at the water's edge on the north side of the inlet.  (Pl. 56.1 Resp. ¶ 7.)

As the officers gathered, so did a growing crowd of approximately 100 bystanders.  (Pl. 56.1 Resp. ¶ 8.)  Lowery and Webb spoke with man who said he would go into the water near the sandy area.  (Pl. 56.1 Resp. ¶ 8.)  Webb saw the man walk about waist-level into the water but then return to the shore.  (Pl. 56.1 Resp. ¶ 8.)  The man told Webb that he could not swim in the water because of low visibility and a strong undertow.  (Pl. 56.1 Resp. ¶ 8.)  Webb then found a lifeguard, who came to the scene with his rescue equipment.  (Pl. 56.1 Resp. ¶ 8.)  The lifeguard declined to enter the water until he could see Evans, telling Webb that the winds, choppy water, and poor visibility made any attempt at rescue dangerous.  (Pl. 56.1 Resp. ¶¶ 8, 12.)  Because of the conditions at the time, rescue by even a trained lifeguard would have been hazardous.  (Pl. 56.1 Resp. ¶ 41.)

Based on the lifeguard's opinion that the conditions were dangerous, Webb began to instruct the people in the crowd not to enter the water.  (Pl. 56.1 Resp. ¶ 9.)  Webb told the crowd that it needed to clear the way for rescue teams that were on their way.  (Pl. 56.1 Resp. ¶ 9.)  The Officer Defendants heard individuals state that they could swim, but no one in the crowd took any steps to enter the water.  (Pl. 56.1 Resp. ¶ 9.)  Although none of the Officer Defendants threatened anyone in the crowd with arrest if they attempted to jump in the water to save Evans, (Pl. 56.1 Resp. ¶ 10.), Lowery told an individual that he "did not need him to go into the water."  (Pl. 56.1 Resp. ¶ 14.)  Further, at some point, an unidentified African-American male police officer instructed a second swimmer to exit the water.  (Pl. 56.1 Resp. ¶¶ 4, 13.)  Neither Rogers, Ware, Tabb, Townsend, nor Janik instructed any would-be rescuers to stay out of the water, (Pl. 56.1 Resp. ¶¶ 15. 17.), and

neither Tabb, Townsend, nor Janik, all female officers, saw any individuals attempt to enter the water.  (Pl. 56.1 Resp. ¶¶ 16-17.)

The waves were getting stronger as the night wore on.  (Pl. 56.1 Resp. ¶ 6.)  Just before the rescue helicopter and divers arrived, the Beach Manager, who is captain of the lifeguards, arrived at the seawall and was preparing to enter the water.  (Pl. 56.1 Resp. ¶ 11.)  The Officer Defendants told bystanders to step back from the seawall to clear access for emergency workers, including the helicopter, rescue workers, ambulances, and other rescue personnel.  (Pl. 56.1 Resp. ¶ 20.)  When the trained divers could not find Evans underwater, officers escorted Wright and Holness to the approximate scene of the incident.  (Pl. 56.1 Resp. ¶ 5.)  Wright and Holness pointed out the spot on the rocks where Evans fell into the water and the divers finally located Evans's body.  (Pl. 56.1 Resp. ¶ 5.)  Once he disappeared underwater, Wright and Holness never saw Evans again until the divers pulled his body out of the water, approximately twenty-five minutes after Wright's 911 call. (Pl. 56.1 Resp. ¶ 5.)

The City, a municipal corporation and employer of the Officer Defendants, has no specific policy on how an officer should react to a situation in which a bystander might come to the aid of a drowning person.  (Pl. 56.1 Resp. ¶¶ 1, 19.)  The City expects officers to use their best judgment under the particular circumstances when deciding whether to allow a bystander to attempt to rescue a drowning person.  (Pl. 56.1 Resp. ¶ 20.)

**STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(C).  In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment.  An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (" 'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

### I.  Pulliam's Response to the Defendants' Rule 56.1 Statement of Uncontested Facts

Before reaching the merits of the Defendants' Motion, the Court must address a number of deficiencies in Pulliam's response to the Defendants' Rule 56.1 Statement of Uncontested Facts ("Defendants' Statement of Facts").  Local Rule 56.1 allows a party opposing summary judgment to file a concise response to the movant's statement of facts containing: 1) a response to the movant's statements of fact including, in the case of disagreement, specific references to materials relied upon; and 2) no more than forty statements of additional facts.  *See* L.R. 56.1(b)(3)(B) & (C).  If the party opposing summary judgment submits additional facts, the moving party may submit a concise

response to those facts. *See* L.R. 56.1(a).[2] Nonconformity with the Local Rules is not without consequence. The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)).

Here, many of Pulliam's responses to the Defendants' fact statements are improper. First, Pulliam objects to paragraphs 11, 12, and 13 of the Defendants' Statement of Facts as being merely accounts given by the witnesses in their depositions and that these accounts are not otherwise corroborated. (*See* Pl. 56.1 Resp. ¶ 2.) Pursuant to Local Rule 56.1(a), however, the Defendants have supported these statements of fact with specific citations to depositions in the record and Pulliam cites to no Federal Rule of Evidence that would render the depositions inadmissible. Thus, the Court deems paragraphs 11, 12, and 13 admitted.

Second, Pulliam objects to paragraphs 39, 40, and 47 because, she argues, they are a restatement of facts set forth in the Defendants' self-serving affidavits. (*See* Pl. 56.1 Resp. ¶¶ 10, 10, 47.) Affidavits, however, even "so-called 'self-serving' affidavit[s]," are properly part of the record on summary judgment as long as the affidavits are based on personal knowledge. *See Dalton v. Battaglia*, 402 F.3d 729, 735 (7th Cir. 2005); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). Therefore, the Court deems paragraphs 39, 40, and 47 admitted.

---

[2]The Defendants failed to conform with Local Rule 56.1 by filing a Reply to Pulliam's Response to Defendants' Statement of Undisputed Material Facts. Local Rule 56.1(a) provides that the moving party may only submit a concise reply in the form prescribed in Local Rule 56.1(b)(3)(B) for a response if the opposing party submits additional material facts. Here, Pulliam did not file a statement of additional facts. The Defendants did not seek leave of court to file this extra document and it is not contemplated by Local Rule 56.1. Accordingly, the Court has disregarded the Defendants' Reply to Pulliam's Response to their Local Rule 56.1 Statement of Undisputed Material Facts in its entirety.

Third, Pulliam objects to paragraphs 32-36 because "[t]hey include details of previously undisclosed conversations with unidentified third parties, about which the plaintiff knows nothing." (*See* Pl. 56.1 Resp. ¶ 8.) Pulliam provides no citation to any Federal Rule of Evidence as to why the Court should exclude these paragraphs. The Defendants have supported paragraphs 32-36 with a citation to one of the Officer Defendant's affidavits, which, as discussed above, is enough to support the fact statement as long as it is based on personal knowledge. To the extent that Pulliam is objecting because the statements of fact are based on hearsay, the Court finds that the statements by the man who entered the water, (*see* Def. 56.1 ¶ 32-33.), and by the lifeguard, (*see* Def. 56.1 ¶¶ 34-36.), are not offered for their truth, but for the effect their statements had on Webb. *See* Fed. R. Evid. 801(c). The Court also deems paragraphs 32-36 admitted.

Fourth, Pulliam objects to paragraphs 37 and 38, stating that they are "directly controverted by the testimony of witnesses Sutton and Harris." (*See* Pl. Resp. 56.1 ¶ 9.) Pulliam, however, does not provide a specific citation to the record to support her objection. If a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *Ammons*, 368 F.3d at 817-18 ("Citations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate."); *see also, e.g.*, *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial."). Thus, the Court deems paragraphs 37 and 38 admitted.

Finally, and most importantly, Pulliam objects to paragraphs 18 and 19. In this response, Pulliam cites to specific pages of the deposition of Vernell Harris Brown ("Harris Brown"). Pulliam,

however, cites to pages of Harris Brown's deposition that are not in the record and Pulliam did not file any affidavits or other materials to support this statement. Pulliam includes the relevant excerpts to Harris Brown's deposition in her Memorandum of Law,[3] however, because she did not provide the Court with a copy of the transcript itself, the Court deems paragraphs 18 and 9 admitted.

Pulliam also states that the facts in paragraphs 18 and 19 "are contradicted, for example, by the statements of Ms. Harris in her deposition that the swimmer in the water was close enough to actually see the drowning child." (*See* Pl. 56.1 Resp. ¶ 4.) From admitted paragraph 42, which states that "[o]nly one male African American Officer was identified as having instructed a citizen to exit the water[,]" (*see* Pl. 56.1 Resp. ¶ 13.), the Court can infer that there was a second swimmer in the water at some point during the incident other than the man who walked waist-deep into the water. Thus, the Court deems admitted the fact that there was a second swimmer in the water and that a male African American officer told that swimmer to exit the water. (Pl. 56.1 Resp. ¶¶ 4, 13.) As for the admission of the second fact—that the second swimmer was close enough to actually see Evans—this fact is not a part of the Defendants' Statement of Facts, nor did Pulliam include in her Response any additional facts pursuant to Local Rule 56.1(b)(3)(C). The Court disregards a denial that does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's 56.1 statements of fact. *See, e.g.*, *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). Similarly, while Pulliam relies on this fact in her Response brief, the Court disregards any additional statements of fact contained in a party's response brief but not in its Rule 56.1 statement of additional facts. *See, e.g.*, *Malec*, 191 F.R.D. at 584 (citing

---

[3] The Defendants attached the relevant pages of Harris Brown's deposition transcript to their Reply to Pulliam's Response, but the Court struck that document in its entirety because it is not allowed under Local Rule 56.1. *See supra*, note 2.

*Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995)) ("Simply providing additional facts in one's responsive memorandum is insufficient to put those facts before the Court."). "A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56. 1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005). Accordingly, the Court disregards Pulliam's statement that the second swimmer was close enough to Evans to actually see him, as well as any arguments that rely on that statement.

## II.     Pulliam's Due Process Claim Against the Officer Defendants

Count I of Pulliam's Amended Complaint alleges that the Officer Defendants deprived Evans of his life in violation of the Due Process Clause by keeping bystanders out of the water. According to Pulliam, had the Officer Defendants allowed bystanders to enter the water, they would have rescued Evans and prevented his death. The Defendants argue that Janik, Norwood, Payne, Snelling, Starks, Tabb, Townsend, Rogers, and Ware are entitled to summary judgment on Count I because no evidence in the record supports the claim that they kept any bystanders out of the water. The only remaining Officer Defendants, Lowery and Webb, claim that they are entitled to summary judgment on qualified immunity grounds.[4]

### A.     Janik, Norwood, Payne, Snelling, Starks, Tabb, Townsend, Rogers, and Ware

A defendant is only liable under § 1983 if he or she was personally involved in the constitutional violation. *See Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003). Pulliam admits that

---

[4]The Court notes that qualified immunity is an affirmative defense that must be raised by a defendant. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). The burden is on the defendant to not only plead the defense, but to adequately develop it for the Court's consideration. *See Walsh v. Mellas*, 837 F.2d 789, 799 (7th Cir. 1988). Here, although they raise the defense in their opening brief, it appears upon review of the docket that the Defendants never filed an answer in this Court. Nevertheless, Pulliam did not move for a default judgment, nor did she raise the issue in her Reply. Thus, because Pulliam has not objected to the defense, the Court will address it here.

Payne, Norwood, Snelling, and Starks were not on duty at the time of Evans's drowning (*see* Pl. 56.1 Resp. ¶ 3.); thus they cannot be liable for violating Evans's civil rights. Further, there is nothing in the record supporting the conclusion that any of the female officers ever saw anyone attempt to enter the water or told any bystanders to stay out of the water, (*see* Pl. 56.1 Resp. ¶¶ 13, 15, 17; R. 26, Resp. at 9.) and Pulliam admits that neither Rogers nor Ware told any bystanders not to enter the water. (Pl. 56.1 Resp. ¶ 15.) Because the record does not show that any of these Officer Defendants were personally involved in the alleged constitutional violation, the Court grants summary judgment in favor of Janik, Norwood, Payne, Snelling, Starks, Tabb, Townsend, Rogers, and Ware as to Count I of Pulliam's Amended Complaint.

### B.    Lowery and Webb

The only remaining Officer Defendants, Lowery and Webb, claim they are entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability unless "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To resolve a qualified immunity claim, a court must decide whether the facts that a plaintiff has shown "make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *See Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201-03 (2001)). The Court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818. Here, the Court first addresses whether Lowery and Webb violated Evans's substantive due process rights.

# I.    Violation of Constitutional Right

Pulliam alleges that Lowery and Webb deprived Evans of his life in violation of the Due Process Clause by keeping bystanders out of the water.  Had they been allowed to enter the water, Pulliam alleges, Evans would not have drowned.  As a general matter, "the Constitution does not require the government to protect citizens from privately created danger." *Witkowski v. Milwaukee County*, 480 F.3d 511, 513 (7th Cir. 2007) (citing *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189 (1989)).  There are two "exceptions," however, to this rule.  The first arises in custodial settings in which the state has limited the individual's ability to care for himself.  *See Estate of Stevens*, 105 F.3d 1169, 1174 (7th Cir. 1997) (citing *DeShaney*, 489 U.S. at 199-200).  The second, known as the state-created danger exception and the exception at issue here, arises "when the state affirmatively places the individual in a position of danger the individual would not have otherwise faced."  *See Estate of Stevens*, 105 F.3d at 1169; *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998).

To recover under the state-created danger exception, a plaintiff must demonstrate that: (1) the state, by its affirmative acts, created or increased a danger faced by an individual; (2) the state's failure to protect that individual from such a danger was the proximate cause of the injury to the individual; and (3)  the state's failure to protect the individual "shocks the conscience."  *King v. East St. Louis School Dist.*, 496 F.3d 812, 817 (7th Cir. 2007).  Under the state-created danger exception, there is no absolute requirement that the state restricted the ability to self-help.  *See Monfils*, 165 F.3d at 517.  Indeed, "a state can be held to have violated due process by placing a person in a position of heightened danger without cutting off other avenues of aid."  *See id*.

### a. State Created Danger

To determine whether Lowery and Webb's affirmative acts increased the danger that Evans faced, the Court must determine what actions Lowery and Webb affirmatively took and what dangers Evans would have faced if those actions had not been undertaken. *See Monfils*, 165 F.3d at 517.

Here, even drawing all reasonable inferences in the light most favorable to Pulliam, the evidence is not sufficient for a jury to conclude that Lowery and Webb placed Evans in a position of danger greater than he would have otherwise faced. When Lowery and Webb first arrived at the scene, they searched the water for Evans from the seawall, but they could not see him from where they were standing. (Pl. 56.1 Resp. ¶ 4.)[5] Lowery and Webb had no specific information about Evans's location in the water. (Pl. 56.1 Resp. ¶ 4.) The two officers allowed one man to get into the water near the sandy area to attempt a rescue. (Pl. 56.1 Resp. ¶ 8.) After going waist-deep in the water, however, the man told Lowery and Webb that he could not swim in the water because of the low visibility and strong undertow. (Pl. 56.1 Resp. ¶ 8.) Webb also brought a lifeguard to the scene, who, after examining the conditions of the water, also declined to enter the water to attempt to rescue the boy until he could see Evans's body. (Pl. 56.1 Resp. ¶¶ 8, 12.) Relying on this information, Webb began to tell bystanders not to enter the water. (Pl. 56.1 Resp. ¶ 9.) He also attempted to clear

---

[5] Pulliam alleges in her Amended Complaint that: (1) bystanders at the scene attempted to enter the water; (2) the officers at the scene threatened them with arrest should they attempt to enter the water; and (3) Evans reached the surface of the water several times after he fell into the Lake. (R. 15, Am. Compl. ¶¶ 5-6.) Pulliam also argues in her Memorandum of Law in Response to the Defendants' Motion for Summary Judgment that the second swimmer was close enough to see Evans before an African American police officer made him get out of the water. (R. 26, Pl. Resp. to Defs. Mot. for Summary Judgment at 2-4.) These facts, however, are not supported by the parties' Local Rule 56.1 Statements of Fact. As discussed in Section I, *supra*, Pulliam failed to properly deny facts that she claims are disputed and she failed to provide any additional facts of her own to support the allegations in her Amended Complaint. (*See* Pl. 56.1 Resp. ¶¶ 2, 9-10 (no cite to the record or to a Federal Rule of Evidence that would preclude the statement), 4 (failed to include in Additional Statement of Facts and failed to attach the relevant portions of Harris Brown's Deposition) .)

the large crowd that had gathered at the scene to create enough space for the rescue teams that were on their way. (Pl. 56.1 Resp. ¶ 9.) Lowery told an individual that he "did not need him to go into the water." (Pl. 56.1 Resp. ¶ 14.) Assuming for Pulliam's benefit that either Lowery or Webb is the "unidentified African American male police officer," one of them also instructed the second swimmer to exit the water. (Pl. 56.1 Resp. ¶ 13.) Neither Lowery nor Webb, however, threatened anyone in the crowd with arrest if they attempted to jump in the water to save Evans. (Pl. 56.1 Resp. ¶ 10.)

Had Lowery and Webb not taken those affirmative actions, Evans would have been in just as much danger of drowning, if not more. Upon falling into the water, Evans sank immediately and never returned to the surface. (Pl. 56.1 Resp. ¶ 5.) Even the trained City divers could not locate the boy's body until police officers escorted Wright and Holness to the scene to point out the exact location that Evans fell into the water. (Pl. 56.1 Resp. ¶ 5.) The conditions at the scene were bad: it was windy, cold, and visibility was low because the sun had already set. (Pl. 56.1 Resp. ¶ 2.) Both the first swimmer and the trained lifeguard recognized that it was dangerous to enter the water before they could spot the boy's body, and there is no indication that either of the two ever saw Evans's body before the divers pulling him out of the water. (Pl. 56.1 Resp. ¶ 8, 12.) The first swimmer and the lifeguard passed this information on the Lowery and Webb, who reasonably decided that allowing any other individuals into the water would only make the situation more dangerous for both Evans and for any would-be rescuers.

Further, while many individuals in the crowd stated that they would jump in the water to save the boy, none but the two swimmers actually made any effort to get into the water. As stated above, the facts show that neither Lowery nor Webb threatened anyone with arrest if they attempted to enter

14

the water. Under these circumstances, it is unlikely that any civilian rescue attempt would have succeeded. Although their efforts were ultimately unsuccessful, is more likely that Lowery and Webb's actions actually decreased Evans's risk of drowning.

In opposing the Defendants' Motion, Pulliam relies primarily on *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990), a case involving the drowning of a child. In *Ross*, during a daytime lakefront festival in the City of Waukegan, Illinois, a twelve-year-old boy fell from a breakwater into Lake Michigan and sank. *Id*. at 1424. The boy's friend immediately ran for help. *Id*. On-duty emergency personnel at the nearby festival promptly answered the friend's call for help and within ten minutes of the boy's entry into the water, two lifeguards, two firefighters, and one police officer were on the scene with their rescue equipment. *Id*. Two nearby scuba-diving citizens also offered personal assistance and their boat and equipment. *Id*. Before anyone attempted to rescue the boy, however, the Lake County Deputy Sheriff ("the Deputy Sheriff") arrived in a patrol boat. *Id*. The City of Waukegan and Lake County had entered into an intergovernmental agreement that required the County to provide all police services in the parties' concurrent jurisdiction in Lake Michigan. *Id*. at 1424-25. Under this authority, the County had promulgated a policy that directed all members of the Sheriff's Department to prevent any civilian from attempting to rescue a person in danger of drowning in the lake. *Id*. at 1425. The policy stated that only divers from the City of Waukegan could carry out such a rescue. *Id*.

Pursuant to this policy, the Deputy Sheriff ordered all of the people on the scene to cease their rescue efforts. *Id*. When the civilian scuba divers stated that they would try the rescue at their own risk, the Deputy Sheriff told them that he would arrest them upon their entry into the water and he positioned his boat so as to prevent their dive. *Id*. A Waukegan police officer agreed that Lake

County had authority over the scene and instructed his fellow city employees to heed the Deputy Sheriff's directions. *Id*. Twenty minutes after the initial rescuers arrived at the scene, and about thirty minutes after the boy had fallen into Lake Michigan, the officially-authorized divers retrieved the boy's body. *Id*. The boy was declared dead the next morning. *Id*.

The boy's mother sued, among other entities, Lake County, the Deputy Sheriff, the City of Waukegan, and the City of Waukegan's Fire Department, Paramedics, and Lifeguards alleging that the Deputy Sheriff violated the boy's civil rights by "interposing state power to prevent rescue" and that the City of Waukegan and Lake County promulgated policies that led the Deputy Sheriff to prevent the boy's rescue. *Id*. The district court dismissed the mother's complaint against Lake County and the City of Waukegan Defendants and granted the Deputy Sheriff's motion for summary judgment based on qualified immunity. *Id*. at 1426. The Seventh Circuit affirmed the district court's judgment as to the City of Waukegan Defendants, but reversed the district court's decisions as to Lake County and the Deputy Sheriff. *Id*. at 1434. Accepting as true the allegation that Lake County had a policy that required the Deputy Sheriff to prevent any unauthorized person from attempting to rescue another person in danger of drowning and that "unauthorized persons on the scene could have saved [the boy's] life," the court held that the complaint sufficiently alleged that the county arbitrarily deprived the boy of his right to life. *Id*. at 1429-30. The court then held that the Deputy Sheriff was not entitled to qualified immunity because the constitutional right that prevented a police officer from cutting off private avenues of aid without providing an alternative was clearly established at the time of the incident. *Id*. at 1432-33.

The facts here are distinguishable for a number of reasons. First, unlike the situation in *Ross*, where the Deputy Sheriff affirmatively halted the attempted rescue of a drowning boy by two

lifeguards, two firefighters, one police officer, and two scuba-diving citizens, all of whom were on the scene with their rescue equipment, here, while waiting for emergency personnel to arrive, Lowery and Webb allowed one man to attempt a rescue and actively sought out a lifeguard who came to the scene with his rescue gear. Both men informed Lowery and Webb that the conditions of the water were dangerous and a rescue attempt would be futile. Significantly, a trained lifeguard declined to enter the water until he could see Evans's body due to the dangerous conditions of the water at the time. Unlike the Deputy Sheriff, neither Lowery nor Webb threatened any of the bystanders with arrest if they attempted to go in the water after the boy. Additionally, unlike the Deputy Sheriff, who positioned his boat to prevent the boy's rescue by the people at the scene, neither Lowery nor Webb made it impossible for any bystanders to get into the water. For those reasons, the Court finds the *Ross* case to be factually distinguishable and finds that Lowery and Webb did not create or increase the danger that Evans was already facing when they arrived at the scene. Because the Court finds that Lowery and Webb's acts did not create or increase the danger Evans was already facing, it does not reach the issue of whether those acts were the proximate cause of Evans's death.

### b.    Conscience Shocking

Even if the Court were to assume that Lsowery and Webb acted affirmatively to increase Evans's risk of drowning and that those actions were the proximate cause of Evans's death, their actions could not be characterized as anything other than mere negligence. Conduct by state actors that shocks the conscience is conduct that may be deemed "arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Whether an individual's conduct "shocks the conscience" in a given case is necessarily a fact-bound inquiry. *Id*. at 850. While the standard is not precise, the emphasis is on "the tort law's spectrum of liability." *See id*. at 847-48. "Only

conduct falling toward the more culpable end of the spectrum shall be found to shock the conscience." *King*, 496 F.3d at 819. Thus, if the circumstances allow for "reasoned deliberation in their decisions," a court will find the state actor's conduct "conscience shocking when it evinces a deliberate indifference to the rights of the individual." *Id*. If, however, the circumstances "call for hurried judgments" to protect public safety or maintain order and deliberation is impractical, "conduct must reach a higher standard of culpability approaching malicious or intentional infliction of injury" before it is found to be "conscience shocking." *Id*. In all cases, the conduct must be more culpable than "mere negligence." *Id*. (citing *Lewis*, 523 U.S. at 849).

Here, the Court need not decide whether the higher standard of culpability applies because Pulliam has failed to present facts that rise to either level. *See, e.g.*, *Bublitz v. Cottey*, 327 F.3d 485, 490-91 (7th Cir. 2003) ("[W]e need not choose between the two formulations of the constitutional standard (even assuming they present different inquiries), as we believe that [the plaintiff] has not presented facts which rise to either level."). In light of the poor conditions of the water, their inability to locate Evans's body, and the large crowd that had gathered to watch the event unfold, Lowery and Webb's decision—only after the lifeguard on the scene refused to enter the water because it was too dangerous—to try to keep the bystanders out of the water and to concentrate on clearing a path for the emergency personnel that were on their way was at most a negligent decision. Similarly, if either Lowery or Webb is the unidentified African American male officer who told the second swimmer to get out of the water, that instruction could not be deemed more than negligent under the circumstances.[6] It is clear from the record that all of Lowery and Webb's actions were

_____

[6]This is true even if, as Pulliam argues, the second swimmer could see Evans in the water. While it is possible that the cost of allowing the second swimmer to stay in the water was less than the expected benefits of keeping him out of the water, even "gross negligence does not violate the Due Process Clause." *See Archie v. City of Racine*, 847 F.2d

focused on successfully rescuing Evans. Viewing the evidence and drawing all reasonable inferences in Pulliam's favor, as the Court is required to do, Pulliam is unable to show that Lowery and Webb violated Evans's due process rights under the unique circumstances of this case.

Having determined that Lowery and Webb did not violate Evans's constitutional rights, the Court need not reach the second step of determining whether the officers are protected by qualified immunity. *See Estate of Stevens*, 105 F.3d at 1178. Therefore, the Court grants summary judgment in favor of Lowery and Webb as to Count I of Pulliam's Amended Complaint.

## III.    Pulliam's Claim Against the City

Count II of Pulliam's Amended Complaint alleges that the deprivation of Evans's right to life was caused by a custom, policy, or practice of the City. Specifically, Pulliam asserts that the Officer Defendants' refusal to allow bystanders to rescue Evans "was in concurrence with and pursuant to the policy and rules of the City . . . , which require a police officer to forbid and prevent any unauthorized person to enter the water in an attempt to rescue a person in danger of drowning." (R. 15, Am. Compl. ¶ 8.) A municipal body may be liable for monetary damages under § 1983 if the unconstitutional act at issue is caused by: "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *See Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978)).

Here, Pulliam has failed to set forth any facts to support the premise that the Officer Defendants or any other City employee were acting pursuant to a City policy or custom or that they

---

1211, 1219 (7th Cir. 1988).

violated Evans's constitutional rights. *See Schor v. City of Chicago*, 576 F.3d 775, 779 (7th Cir. 2009) ("[T]he plaintiff must begin by showing an underlying constitutional violation."); *King*, 496 F.3d at 817 ("It is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [the plaintiff's] constitutional rights.").[7]

Further, despite the broad-sweeping allegations in Pulliam's Amended Complaint that they City has a "policy and rules" that "require a police officer to forbid and prevent any unauthorized person to enter the water in an attempt to rescue a person in danger of drowning," Pulliam now admits that the City has no specific policy on how an officer should react to a situation in which a bystander might come to the aid of a drowning person and that the City expects its officers to use their best judgment under the circumstances when faced with such a situation. (*See* Pl. 56.1 Resp. ¶¶ 19-20.) Pulliam does not allege that the constitutional violation was caused by an unauthorized, though widespread governmental practice or custom or by an official with final policy-making authority. Without an underlying constitutional violation and with an admission that the City has no policy on this issue, Pulliam's § 1983 claim against the City fails. For those reasons, the Court grants summary judgment for the City on Count II.

---

[7]To determine whether the City's liability is dependent on the Officer Defendants' liability, the Court looks to "the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Thomas*, 604 F.3d at 456. Here, Pulliam sued the City because she thought the City was responsible for the Officer Defendants' actions. There is no allegation or suggestion in the record that any other City employee violated Evans's constitutional rights. Additionally, while Lowery and Webb asserted qualified immunity, the Court granted their Motion for Summary Judgment on Count I because they did not violate Evans's constitutional rights, not because of a finding that the right was not clearly established at the time of the violation. (*See* Section II, *supra*.) Thus, "there is no wrongful conduct that may become the basis for holding the City liable" under *Monell*. *See Schor*, 576 F.3d at 779.

## **CONCLUSION**

What happened to Evans is undoubtably tragic and the Court sympathizes with Pulliam for the obvious suffering that she has incurred having lost a child under such circumstances. Nevertheless, Pulliam has failed to raise a genuine issue of material fact as to whether the Officer Defendants deprived Evans of his due process rights and whether that deprivation was the result of the City's policy or practice. Accordingly, the Court grants the Defendants' Motion for Summary Judgment as to both Counts of Pulliam's Amended Complaint.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: August 12, 2010